Thank you, Your Honor. May it please the Court, my name is Thomas Woodbury and I have the privilege today of representing Glen Monaghan and Nancy Schultz, who were actually two Seattle school teachers that retired to Montana about 20 years ago and became river guides and started guiding people down the river in canoes in the area that is now the monument. I don't think you could find two people who know that river better or who care more about it than Nancy and Glen and they joined Western Watersheds Project because of that organization's leadership and expertise on public lands grazing issues. Your Honor, this case represents or concerns the continuing and unabated degradation of natural resources by cows in the Upper Missouri River Breaks National Monument, one of the crown jewels of our National Landscape Conservation System, which is intended to conserve, protect, and restore nationally significant landscapes for present and future generations of Americans. The Bureau of Land Management's own experts acknowledge that livestock grazing has severely impacted riparian habitat along the riverbanks of the Upper Missouri River and the importance of this riverine habitat to the broad diversity of fish and wildlife species found in the monument is not in dispute. Rather, BLM takes the position that livestock grazing in this particular monument, alone among all national monuments, takes precedence over all competing uses, such that alternatives to existing levels of livestock use were not even considered in developing a comprehensive resource management plan for the monument. Your Honors, the law is well settled that BLM must consider a range of grazing alternatives to address the ongoing cumulative and severe damage to riparian and other natural resources from nearly a century of dedicated livestock use. Such a range of alternatives would include a preferred environmental alternative, allowing for the full recovery of the natural potential of riparian habitats along the Missouri... Counsel? Yes, Your Honor. So you, I'm looking at the proclamation and I just want to make sure I understand the predicate for your argument. Where are you drawing restoration from the proclamation? It talks about protecting objects and the proper care and management. It also specifically provides, as you know, for the continuation of grazing. So this seems to be a fundamental issue here as to, given two announced policies that the proclamation contains within its own terms, you're suggesting that somehow, because grazing is preventing restoration, somehow grazing has to give way, if that's the thrust of your argument. And that's not exactly clear to me from the language of the proclamation, since it doesn't use the word restoration. Yes, Your Honor. Could you include that in your addressing? Sure. We are, we acknowledge that grazing is recognized as a appropriate continuing use in the monument. However, there is nothing in the proclamation that says grazing shall continue at current intensities and that the agency never has to consider reducing grazing in order to meet other objectives of the monument proclamation. Doesn't that mean that they have some discretion in how they go about implementing that particular policy provision? They would exercise that discretion would be in full compliance with NEPA by considering a range of alternatives. And then based on full, on public input and participation, they would exercise that discretion to explain to the public how their decision would be consistent with the monument. So as I understand your claim, you have two separate claims. Is that right? Yes. Can I finish answering your question? Because the policy that he raises, I just wanted to clarify that quickly. Your Honor, the monument proclamation preserves or incorporates existing laws, regulations, and policies in existence at the time of the proclamation. And the Bureau of Land Management or the Department of Interior had recently adopted a far-reaching policy called the National Landscape Conservation System, whose mission is to restore those habitats. So that was, and that specifically applies to national monuments. So that's for that. Thank you. I'm sorry. No, no, I'm sorry. Go ahead. I just. Okay. But continuing along that same line in compliance with the FLIPMA, the main governing statute for BLM, a choice of alternatives and exercising that discretion would, they would also have to show that they are in compliance with FLIPMA's basic requirement of sustainability and sustaining uses. And in this case, we have a record that clearly shows that they are in danger of forever losing the, one of the most important objects of the monument and the most important habitats, which is cottonwood, forest, gallery ecosystems. So let me, as I understand the respect to grazing, the BLM proposed to maintain the same standards in the 1990, was it the 1997 grazing standards? The range land standards and guidelines. Right. You're much more familiar with all these policy state names and whatnot than I. But I guess your argument is that that just doesn't do the trick, right? That's correct. Why not? Well, first of all, those standards were designed for a different purpose. They did not take into consideration uses other than livestock and they were designed to basically achieve eventually a minimum level of stream stability. That's what you, you know, is called properly functioning condition and that's the main, the main standard from those guidelines. It's a misnomer, however, to call that a standard since they don't actually have to comply or reach those during the life of a permit or at any particular time, in fact. And even today, you know. You mean they're not bound by those standards? They're not. That's the kind of discretion that BLM normally enjoys, which is a fairly unlimited discretion compared to other land management agencies in balancing multiple and competing land uses. So under normal conditions, they tend to favor livestock uses to the exclusion and or at least detriment of other uses, such as riparian habitats. And the type of diversity of wildlife species of natural conditions that is an object of the monument proclamation would never actually have to be achieved under the 97 standards and guidelines. In fact, we have BLM statements, expert statements in the record that almost, you know, here we are over a decade after the adoption of those guidelines and still most, if not all, of the riparian areas do not meet the minimum conditions. So is it your position that in order to carry out the meaning and the purpose of the proclamation that BLM has to basically either eliminate grazing in the severe, they have to cut back significantly? Yeah. They would have to consider a range of alternatives that would, I think, would, you know, have to consider a no grazing alternative. In fact, their own guidelines would require them to do that now. Guidelines that have been adopted from their DC office since this litigation. So if they were to study it today, if they were to consider a broad range of alternatives for grazing, they would consider a no grazing alternative just to provide a baseline for what would the monument look like if there were no cows. But no, they would not be required to eliminate cows from the monument and I don't think it's realistic to expect that's ever going to happen. But I should also point out that in, you know, it's kind of an unusual situation in the monument. In most of the Bureau of Land Management lands that I've been involved with that are not subject to special designations, they go out of their way to keep cows away from the streams to protect riparian resources and fisheries and wildlife. And in this particular area, for historic reasons, they basically have encouraged and almost allow the cow, well not almost, they allow the cows basically to concentrate along the banks and therefore the riparian habitat is severely impacted as the science clearly shows. So yeah, they would have to consider a range of alternatives. And your honor, the best way to get an idea of what that would look like is to actually go back and look at the 1979 EIS, which is the last time they did an EIS in compliance with NEPA for grazing in what is now the monument. And they had a range of alternatives there and I believe it was the 40 percent reduction in grazing that they called the wildlife propagation alternative. So they basically recognized and they recognized in there that they were never going to actually be able to benefit wildlife without some measure of reduction. And that's why it's so politically unpopular to even consider complying with NEPA in this case. Now as I understand the complaint here, you also had a challenge to a particular grazing permit. Yeah. The Woodhock. Yes. Which they did a, they did not do a full EIS, they made an environmental assessment saying that EIS was not necessary. We waited for the first, you know, basically the resource management plan said that we'll deal with grazing in our watershed management plans, that's why we've always done it and we'll continue to do that, we think that's adequate. So we waited for the first one to come up before we challenged them. They come up on a regular basis, don't they? Yes they do. And your honor, that is exactly, that Woodhock EA is exactly a perfect illustration of the problem. The range of alternatives there, I think there's three or maybe four alternatives and they all are for the exact same level of grazing that has adhered in that area for as, you know, since 1979 at least. And so they never, and they considered anything that would actually attain, achieve natural levels of habitat, restoration basically of riparian habitat outside the scope of the project because they wouldn't be allowed to continue existing levels of grazing and still attain that sort of habitat restoration. So to me that's like a perfect illustration of why they basically need to be forced to do an EIS, but also be forced to, it needs to be made clear that in managing the resources of the National Monument, they have to comply or explain why they're not complying with far-reaching policies like the National Landscape Resource Conservation System and they have to... Can you answer, this is just a practical question for me, so the Woodhock, it's the Woodhock allotment that was up for this EI? Yes. Up for renewal. Within an allotment are there individual permits that ranchers get? Yes, I believe it's a series of permits within that watershed. And are you able to challenge individual permits? Only through, only through challenging. The permits basically come up for renewal in that, all at the same time in that watershed and that they do the watershed EA in order to renew the permits. So no, I mean... And how long are the permits good for? 10 years. 10 years. So yeah. So the last thing I want to ask a question to clarify. Okay. Just on that is what is it you'd have us order on the Woodhock allotment? On Woodhock? Yeah, is it that the agency do a full EIS? Well, if they do, see this is the problem of the way they're tiering things back and forth. So the problem is they've never done an EIS to consider the impacts of grazing on the object of the monument. So whether they go back and do a supplemental EIS for the resource management plan and consider a range of alternatives for the monument and then tier the, an EA for Woodhock to that, or whether they do an EIS for Woodhock and consider it there, you know, that that would be their one or the other. So basically we're asking you vacate the EA and say, you know, there's no EIS to tier it to and it's a significant impact and they haven't considered a broad range of alternatives. And in fact, they haven't taken a hard look in either place. The last point I wanted to make on the standards and guidelines is in the brief, they go on and on about these standards and sure, blah, blah, blah, blah. And yet in the record of decision, they refer to them as goals to achieve or make significant progress toward properly functioning, proper functioning condition. And there are state hydrologists, and as we pointed out, you know, raises questions, raised questions all along, it's like proper function conditioning is just the beginning point for actual restoration of habitat. It's basically how you get a stream to a point where a flood is not going to take the banks away. I think Judge Fisher had a question. Yes, Judge Fisher. Okay. So PFC, they're not standards, they're goals, and they have broad discretion. Basically, they have to show that they're making progress. And that's a subjective determination. And it just emphasizes the inadequacy of the existing management regime for purposes of protecting the monument for future generations. And, you know, basically sustaining cottonwood galleries and figuring out how to reverse that I'd like to reserve your time. Yeah, thanks. Thank you. Thank you, Mr. Woodbury. We'll now proceed with the appellee's argument. Is this Mr. Stockman? Yes, Your Honor. Thank you. May it please the court. My name is Robert Stockman here on behalf of BLM. With me at counsel's table is Hertha Lund, representing the interveners in this appeal. I intend to speak for 15 minutes and to leave the remaining minutes to Ms. Lund. In this appeal, Western Watersheds is challenging BLM's grazing policies by challenging two independent agency actions, the RMP and the permit renewal. I'd like to address the challenges of the RMP first. And there Western Watersheds is raising two separate legal arguments, and it helps to separate them out. One is they contend that the RMP does not comply with the proclamation as in developing the RMP, BLM didn't take the hard look required by NEPA. And I'd like to address those two separately, starting with the FLTMA challenge. And the point of this RMP was to bring the management of the monument in line with the proclamation, which established this monument. And so BLM, in going about that, defined the scope of the RMP process in light of the proclamation's express directives. And as we'll see in the next case, BLM made many, many changes to transportation, oil and gas leasing, and recreation to protect the objects of the monument. But BLM reasonably decided not to revisit its recently developed programmatic grazing policies because the proclamation says that grazing policies shall continue to apply. However, it bears emphasis, part of the dispute here is a factual dispute. And BLM, the record before the court or before the agency simply doesn't support some of Western Watersheds' assertions. BLM committed to applying its current grazing policies in a manner that protects the monument objects. And they took a very exhaustive look at the impacts from grazing. And they found that based on the evidence, they could manage those impacts in a way that would protect the monument objects through their watershed process and by applying the standards and guidelines. And there are a few record sites that I think are really informative here. I mean, we cite a lot in our There's no current resource need to review the grazing policies at a programmatic level. And part of that is I think the repairing areas and cottonwood galleries are the best example of this because they are a crucial object. And BLM analyzed the impacts from grazing, but they found that the conditions were expected to improve, that improvements have already been seen, and that the ratio, for example, of saplings to mature cottonwoods, which is what you need for replacement, is currently one to one on BLM lands. I think the key pages here are in the supplemental excerpts 299 to 300, 465 to 67, 475 to 76, and then 556. Those explain that cows are playing a role in the environment that used to be played by other species, buffalo and bison. And I think 475 to 76 shows how the Woodhock allotment has turned around completely. Look at the image from 1997 and compare it to the image in 2007. And the Woodhock allotment has made a lot of improvements. And then finally, BLM noted that in its watershed process, it would reduce grazing if it was necessary to meet the standard and guidelines and if it's necessary to protect the objects of the monument. And that's at page 726. So they found that the proclamation doesn't require programmatic changes in this RMP. And instead, they're going to be analyzing grazing in their site-specific planning as part of their broader watershed analysis. And I think BLM's interpretation of proclamation is supported by its plain language, its structure, and its history. The proclamation says grazing policies shall continue to apply. And reviewing the grazing policies as part of an RMP that is designed specifically to bring the proclamation into compliance would be a change in policy. It's the exact opposite of what the language suggests. And I think that it helps, I mean, the opposite would render that surplusage. To say, well, protect the objects, and that's all, renders that provision nothing. So BLM had to reconcile these two directives, and they did so in the RMP. I think the history of the RMP... Council, I just want to clarify that point. The language of the proclamation says that laws, regulations, and policies followed by BLM in issuing and administering grazing permits or leases on all lands under its jurisdiction shall continue to apply with regard to the lands in the monument. That's in contradistinction to the proclamation, which is also declaring this area now to be a monument. And that imposes on BLM a high obligation to proper care and management of the objects protected by the proclamation. Now, I don't know what it means to say no programmatic changes are required because under grazing permit management, presumably when the allotments come up for programmatic grazing responsibilities to decide whether or not to extend grazing permits, cancel them, decide that now the time has come in some of these allotments where cattle grazing is going to so destroy the monuments that the permits must be eliminated or substantially reduced. So I don't understand when BLM is arguing that no programmatic changes are needed, what that means. It leaves me uneasy that somehow BLM is reading this as saying, well, there was a political compromise here and grazing is grandfathered in and you can't make any changes. And I apologize if I was unclear. BLM's position is that in this proclamation, there wasn't meant to be programmatic changes. And by that I mean the overall standards and guidelines are acceptable. The watershed process is acceptable. It didn't need to be addressed at the RMP level. But in each and every watershed analysis, and we'll discuss this in more detail when we get to the Woodhock renewal, BLM does look at the impacts of the monument objects. And depending on the conditions on the ground, they make changes. And that's, I guess, the distinction there is site-specific. There, you're making a decision about what renewal is going to happen or not happen with respect to a specific watershed and a specific set of permits. So BLM decided not to revisit it in this resource management plan, which is the overall program management, and not to revisit its broader policies such as the standards and guidelines. But that doesn't mean the proclamation has no, the protection isn't relevant in applying it on the ground in the watershed and EA process. And I think that it's also helpful to look, to understand this at Secretary of the Interior Babbitt's statements that were contemporaneous with the proclamation. And this was really his idea. And he said, and I quote, this is on page 968, consistent with the implementation of the standards and guidelines, as well as other applicable law, grazing should continue and BLM's mandates regarding livestock grazing should not be affected. We should not address specific grazing levels in the conservation effort. And I think what this reflects is that there was a judgment that grazing could continue on this monument, and consistent with protecting the objects. There was a scientific judgment, there was a political judgment, but a scientific judgment that on this monument, grazing is a historical use that's been going on for almost 100 years. It can continue and protect the monument objects. And that's very different than some other monuments. There are other proclamations that say no grazing. There are other proclamations that say review grazing. But this one, there was a judgment made by BLM, by the Secretary and then by President Clinton, that grazing here could continue, consistent with protecting it. And I think that that brings me to the NEPA analysis a In this, BLM did look very closely at how grazing impacts the monument objects. And they talked extensively about what they were going to do in their application of their program policies of the standards and guidelines to protect the monument objects. And they thoroughly examined the environmental effects. What they didn't do is consider grazing alternatives at this RMT level. But that's appropriate because in setting out how you approach NEPA analysis, you look at what directives, what statutory directives, here are the proclamations directives you're acting under. And the agency was under a directive to allow grazing policies to continue while being under a broader directive to bring everything in line. So the NEPA analysis here looked at grazing, looked at it extensively, but didn't consider it as alternatives because they were guided by the proclamation. I think it helps to move to the permit renewal because it allows us to see how this plays out on the ground. And here, they're challenging the renewal of the Woodhock permit. And BLM issued it after doing a full environmental assessment. And they found that, in fact, the environment was improving. And I couldn't encourage the court more to look at the appendix to that EA where BLM carefully goes through how the specific stream beds are improving and how the standards and guidelines are playing out. And you have an area where most of the rivers were functional at risk. And now most of them have reached proper functioning condition, which are standards. And they play a major role in BLM's planning. And they include diversity of species. And in the EA, BLM specifically said they were going to manage cottonwood and willow for class diversity, for vegetation. They're not simply ignoring the monument objects. They're considering it as part of applying those standards and guidelines. And that's at page, supplemental excerpts at page 21. So here you have the Woodhock allotment. They found standards one, four, and five were all being met. Now, riparian areas and the water quality have not yet been met. But there's been major improvement. It's a major success story. And this is at page 223. Even cottonwood galleries are doing better. That's on page 252, where canopy cover and age and class diversity has increased. But it's true that there remains steps to be made. And BLM took that into consideration. They identified which river segments weren't meeting their condition. And they made changes to all, to the renewal in such a way as to address each and everything that was falling short of the standards and guidelines. They removed a water reservoir that was near a river. And that will reduce cattle being encouraged to go into that grazing near the rivers, because that's a potential problem to a much shorter window of time. So they're taking steps that address each and every place where the watershed is not yet meeting its standards and guidelines. And that's completely appropriate. That's consistent with the monument's proclamation. The proclamation, which told them to continue their grazing policies, but also to protect the monument objects. I think that it bears noting that BLM also took a hard look at the extent to which they hadn't met their standards. I don't want to pretend that they had been fully met. And they talked about how some areas hadn't reached the standards they had hoped they would meet. But they took a thorough look, and they found that overall, the allotment is remaining either static or in improvement. And they found that changes to this will only improve the environment more. So there's no significant environmental impact. Because the change to the status quo is changes to the permit that improve the condition of the lands on the monument. So I think that that was most of what I'd hoped to cover. But I'm curious if there are any particular questions that the court has. Well, I guess I have a question. If there's no evaluation in the RMP EIS of a major change in grazing policies, in light of the language in the proclamation, that's not going to be done. Does it follow that there's a greater need for extensive review of grazing in the individual allotment permit cases when they come up? That's a good question, Your Honor. I think that they can tear back to what analysis there was, of course. There is analysis of grazing. But it's true that they can't say, well, we considered the no action in the RMP EIS because they didn't. Or the no grazing alternative. I think that each and every watershed EA is going to be analyzed on its own merits as it comes forward. And the Woodhock allotment happens to be a watershed where there's been significant improvement. Still more to be done, but significant improvement. It may well be that with other watersheds, there will have to be a different type of analysis, depending on the conditions on the ground. I think that the level of analysis is going to depend on the situation on the ground. And I think that BLM has shown itself to be doing that very thoughtfully. This record is very thorough, and BLM considered all the evidence before it. Does that answer the question, Your Honor? That answers my question, yes. Thank you. Seeing no further questions, I will leave the podium in the slung. Okay, Ms. Lund, welcome to you. Good morning. Thank you. It's nice to be here. My name is Hertha Lund, and I represent Missouri River Stewards as a group of ranchers in four rural counties in Montana. My clients have a variety of concerns regarding these cases because of the checkerboard pattern of mixed ownership. As you know, there's 375,000 acres of federal land, 39,000 of state land, and 81,000 acres of private land within the monument. It's all checkerboarded in mixed ownership. Today, I'm going to cover a little bit my motion to strike, which is before the court. And the reason I brought that is because Western Watersheds has presented evidence to this court, but that was not before the lower court. It's not part of the record. They did not follow Rule 10. They did not follow the appropriate rule for judicial notice, so I think that information is improperly before the court. I'm also going to cover a little bit what I consider misstatements based on the record. They cherry-picked all these studies, and they did not inform you about other issues, such as the fact some of the big problems on the Missouri River is that we have Fort Peck Dam. We no longer have a pulse of water that goes down there, so a lot of these riparian areas are impacted by the changes in water on the Missouri River because we have the Fort Peck Dam. It's not all by livestock grazing. In fact, one of the places they cited, the page talks about overuse by recreationists as being the problem, not livestock grazing. I also want to talk to you a little bit about the fact that Western Watersheds is asking you for a remedy that President Clinton didn't put in the proclamation. He's asking you to go further. At the time that President Clinton, and I'll provide you these examples, did this proclamation, he actually excluded grazing on many of the other ones or modified it. In this case, he chose not to. Lastly, I would talk to you about that if you rule in favor of Western Watersheds, injunctive relief is not appropriate because it has not been determined on the factual basis necessary at the district court. Who are my clients? I'm going to quote to you from a declaration of the Fergus County in support of their motion to intervene. Just to give you an idea of the breadth and the scope of this land, Fergus County is one of four counties and they have a total of approximately 2,714,880,000 acres. Of those acres, 483,895 are within BLM's management. Of the BLM's acres, 131,355 are within the monument boundaries. The other thing that's important to note, that Fergus County, along with the other four counties, were granted cooperating agency status. They sat through all these meetings. I can guarantee you that they are not happy with the outcome that this. In fact, I represented them and we filed a protest. We filed a protest that what the BLM did, did not adequately protect grazing according to the Taylor Grazing Act and FLTMA. At the end of the day, we chose not to appeal in district court because my clients are fairly pragmatic and they thought that this case went, or this EIS went way too far towards the environmentalists, but they chose to take certainty and continue on with their lives. Yet, we're here today because the relief that has been enacted, the injunctive relief, would impact their families and their friends and their ability to provide for their families. There are 40,852 acres in Fergus County that are within the monument boundaries, private acres. If, in fact, the injunctive relief and grazing was not allowed on BLM grounds, what you could get is all of the private ground, 81,000 acres, be fenced because this is all intermingled. It's been that way since before statehood. The other thing that my client, Carl Seelstad, said, who's been a long-time county commissioner, he says, ranchers and other rural settlers have been in Fergus County for over 100 years. They're a large part of the social, economic, and cultural basis that depends on ranching and other agriculture. He said, in fact, the proclamation itself states, the area has remained largely unchanged in nearly 200 years since Meriwether Lewis and William Clark traveled through it on their epic journey, end of quote. Carl said, we feel it's due to the management of the lands by our landowners in concert with the BLM, that that land is in such good shape that President Clinton could say that in the proclamation. Another one of my clients, Cleo Boyce, he's been there for the third generation. His children are the fourth generation. His livestock graze on 18,000 acres of private land and approximately 2,000 acres of BLM land. That just seems huge to those of us who don't live out there. This is high, cold desert. It is rough country and it takes a lot of acres to sustain a cow. He maintains that if, in fact, the injunctive relief that sought either for roads or for grazing were impacted, his ability would have severe negative impacts on his ranch and the counties that depend on those ranchers for their tax base and their livelihoods. Lastly, I would point out that there's been some discussion in the briefs that the political was going towards the ranchers. My client said that when the monument was being created behind closed doors in coordination with the Montana Wildlife Federation and the Montana Wilderness Association, there was much opposition in Montana to this proclamation. They opposed it and now Western Watersheds and the other groups are trying to get you to give them what President Clinton didn't give them. If you look at some of the other monuments that happened during the time that President Clinton did that, I'd refer you to the Hanford Reach Monument, June 9, 2000. This is on page 29 of our briefs. In that one, he did change livestock management. In the Sonoran Desert Monument, he actually prohibited livestock grazing and he changed it in another one that he set. In this case, President Clinton chose not to change things. Some of the groups were involved in the politics to get the monument set and they didn't get everything they wanted. Going back to the record, we had this discussion about how on page 41 of the Western Watersheds opening brief, they talk about how livestock has caused the problems to cottonwoods and they cite the record at 725 and 726. What they didn't tell the court was that this report actually says, to address these concerns, we initiated a study of the influences of post-dam fluvial geomorphic processes and long-term grazing. So there's all these issues by the dam and stuff that isn't included in their documents. Okay, Ms. Lund, I'm afraid you're over your time now, but why don't you figure out a way you can wrap up and then we'll have the rebuttal argument. To wrap up, I would say that if the court were to rule in their favor, injunctive relief would not be appropriate because they have not pled at the lower court or even before this court, they've not met their burden of proving that they're entitled to the injunction based on the balancing factors that they would have to prove. So if they prevail, it would have to be sent back to the lower court for that type of calculation. And thank you for your time and if you have any further questions. Thank you very much, Ms. Lund. Thanks for traveling from Montana for us. Mr. Woodbury, and perhaps part of your rebuttal argument you could address the injunction argument made by Ms. Lund. I didn't really see in the papers where a record was made that would satisfy what the Supreme Court said we're supposed to look at under the so-called winter factors. Okay, I'll do that. I'd like to begin by addressing the programmatic issue that Judge Fisher raised and I'm simply going to address that by reading from the resource management plan itself. Riparian wetland objectives would be met at current stocking levels with adjustments that have been implemented as part of the incorporation of standard for rangeland health and implementation of guidelines for livestock grazing management and recent watershed and other activity plans. Reductions in AUMs, that's a measurement of grazing intensity or level, reductions in AUMs to meet wetland objectives would not likely occur. Riparian management would be emphasized through continuing monitoring and meeting standards for rangeland and health, which is basically what the public has been told now for at least 20 years, if not 30 years, that they will continue to study it and continue to monitor it and take appropriate action when the plans come up for renewal. And then when the plans come up for renewal, like with WDOC, they do not consider any reductions and I would also encourage the court to look at the appendix on riparian habitat objectives in WDOC EA and then please read the Schultz declaration that very carefully points out that things have gotten actually worse and they're backsliding on their goals and they're calling that progress. The laws, policies, and standards that were in existence and incorporated into the proclamation include of course the law, the seminal law of FLPMA that says objects of the National Monument, which this court has recognized as standards in themselves, take precedence over other uses. So the traditional balancing of multiple uses that happens on other landscapes no longer applies and a new balance must be struck. That's not to say that grazing is inappropriate or needs to be eliminated, but a new balance needs to be considered. The law, because certainly the status quo is the trend is not good as all the science and the record shows. The law also requires BLM to take any action necessary to prevent unnecessary and undue degradation of lands and includes authority to alter existing grazing levels or even reclassify and withdraw particularly sensitive degraded landscapes from grazing entirely. So there's the flexibility and discretion that they need to exercise. There's nothing in the proclamation that basically says what they wanted to say, which is that current livestock grazing levels will be maintained in perpetuity. It doesn't say that. I think you better address Judge Gould's question. Okay, I'll do that. I think the record is actually quite clear. It's one of the reasons that we emphasize the science and the factual situation in an undisputed way. The legal remedies are inadequate simply because the delay is the problem. And under Winter, the question is whether there's irreparable injury before the law is complied with. And in this case, we have shown through the science that we provided to the court that irreparable injury, which is an incremental loss of irreversible loss of riparian habitat. In particular, the Cottonwood Gallery forest ecosystems. There's a strong public interest represented by the monument itself, the proclamation itself in protection of the area at issue. Also, the National Land Resource Conservation System evinces that strong public interest. And the only hardships that would occur would be economic, basically. And in Winter, we're dealing with national security. So obviously, there's a different play there. But here, the courts have been very consistent that economic hardship does not outweigh the necessity to protect public land resources. And finally, we're not asking for an injunction that would basically prohibit grazing and continue grazing the monument. While these studies went forward and the law was complied with, we're looking to protect the most critical resources, which is the buffer strip of riparian habitat along the river, which the experts like Hanson have been asking EPA, BLM to consider setting aside for over 20 years. Thank you, Mr. Woodburn. I'm afraid you're over time. Any questions from Judge Pizer, Judge Fischer? Okay, I want to commend counsel for both sides on their excellent arguments. This case, the submitted. And we appreciate your travel also. So thank you all.
judges: Fisher, Gould, Paez